1

2

3

4

5

6

7

8                    **IN THE UNITED STATES DISTRICT COURT**

9                **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11   ANDREW J. CHINCHIOLO,                    No. CIV S-06-1653-CMK

12              Plaintiff,

13        vs.                                  <u>MEMORANDUM OPINION AND ORDER</u>

14   COMMISSIONER OF SOCIAL
     SECURITY,
15
               Defendant.
16
     _____/
17

18              Plaintiff, who is proceeding with retained counsel, brings this action for judicial

19   review of a final decision of the Commissioner of Social Security under 42 U.S.C. § 405(g).

20   Pursuant to the consent of the parties, this case is before the undersigned for final decision on

21   plaintiff's motion for summary judgment (Doc. 20) and defendant's cross-motion for summary

22   judgment (Doc. 22).

23   / / /

24   / / /

25   / / /

26   / / /

# I.  PROCEDURAL HISTORY

Plaintiff applied for social security benefits on March 31, 2004.  In his application, plaintiff claims that disability began on January 14, 1989.  Plaintiff claims his disability consists of a combination of "fractured vertebrae in his lumbar spine, dislocation of his left hip, pain and limited motion in his left hip, leg, and ankle, continued pain due to arthritis despite hip replacement, inability to stand, or walk for very long, and limited mobility."   Plaintiff is a United States citizen born June 6, 1958, with a high school education.  Plaintiff's claim was initially denied.  Following denial of his request for reconsideration, plaintiff requested an administrative hearing, which was held on May 5, 2005, before Administrative Law Judge ("ALJ") James M. Mitchell.

In his February 7, 2006, decision, the ALJ made the following findings:

1.  The claimant filed an application for a period of disability and disability insurance benefits on March 31, 2004, alleging disability beginning on January 14, 1989;

2.  The claimant is 48 years old, is a high school graduate and has past relevant work experience as a carpenter, construction inspector, laborer, and manual labor supervisor;

3.  The claimant met the special earnings requirements for benefits based on disability under Title II oft he Social Security Act at the time of his alleged disability onset and continued to meet those requirements through December 31, 2001;

4.  The claimant has engaged in substantial gainful activity from his alleged onset date through December 31, 1993, and is therefore ineligible for benefits during this time period;

5.  There is no conclusive evidence that the claimant engaged in substantial gainful activity from January 1, 1994, through December 31, 2001;

6.  The claimant has the following medically determinable impairment:  back, shoulder, and elbow pain, and status post left hip replacement;

7.  The claimant's medically determinable impairment significantly limits his ability to perform basic work activities;

8.  The claimant does not have any impairment or impairments that meet or equal the criteria set forth in any applicable section of the Listing of Impairments. . .;

9.   The claimant has the residual functional capacity to perform a limited range of light work with a slight limitation in the ability to perform overhead reaching bilaterally, and slight limitation in his ability to perform simple, repetitive tasks while bearing a slight to moderate degree of pain, and requiring occasional supervision;

10.  The claimant has no impairment which has precluded the performance of his past relevant work as a manual labor supervisor for any period of time which lasted for any consecutive 12 month period prior to his date last insured;

11.  The claimant is able to perform the job of sales clerk. . ., the job of assembler . . ., and the position of cashier. . .; I find these positions constitute work existing in significant numbers in the regional economy;

12.  The claimant's subjective statements regarding pain and other symptoms have been considered, but to the extent that those statements constitute an allegation that the claimant has been precluded from engaging in all substantial gainful activity by a medically determinable impairment or impairments for a period of time which has lasted or reasonably can be expected to last for 12 continuous months, they are not found credible; and

13.  The claimant was not disabled within the meaning of the Social Security Act, at any time on or before the date of this decision.

Based on these findings, the ALJ concluded that plaintiff was not disabled and, therefore, not entitled to benefits.  After the Appeals Council declined review on June 5, 2006, this appeal followed.

## II.  SUMMARY OF THE EVIDENCE

The certified administrative record ("CAR") contains the following medical records:  (1) records from St. Joseph's Medical Center covering the period from February 1989 through February 2003 (Ex. 1F, CAR 116-84); (2) a June 13, 1989, report of an MRI of both hips performed at San Joaquin Magnetic Resonance Center (CAR 195); (3) an August 3, 1989, report by William R. Murray, M.D., regarding plaintiff's left hip (CAR 193); (4) a September 26, 1989, "follow-up note" by William R. Murray, M.D. (CAR 191); (5) a report from Thomas G. Sampson, M.D., following a March 26, 1990, hip replacement (CAR 187-90); (6) a May 10, 1994, report of a left ankle MRI performed at Valley MRI Center (CAR 186); (7) records from

Thomas G. Sampson, M.D., covering the period from January 1999 through June 2003 (Ex. 2F, CAR 199-216); (8) records from Stockton Orthopedic Medical Group covering the period from January 2001 through March 2004 (Ex. 3F, CAR 218-23); (9) records from Sutter Gould Medical Group covering the period from February 2002 through April 2004 (Ex. 4F, CAR 225-55); (10) a May 2004 physical residual functional capacity assessment completed by agency physician Sandra Clancey, M.D. (Ex. 5F, CAR 256-63); (11) further records from Sutter Gould Medical Group covering the period from May 2004 through February 2005 (Ex. 7F, CAR 276-300); (12) progress note dated October 7, 2004, from Thomas G. Sampson (Ex. 8F, CAR 302); (13) further records from Stockton Orthopedic Medical Group covering the period from June 2004 through January 2005 (Ex. 9F, CAR 304-06); and (14) report following April 5, 2005, orthopedic consultation by William L. Bargar, M.D. (Ex. 10F, CAR 308-11).[1]

                    1989

         The record reveals that plaintiff was injured in a skiing accident in January 1989 which resulted in dislocation of his left hip and fractures to several vertebrae as well as his rib cage.[2]

         An MRI of both hips was performed on June 13, 1989, by J. Jamshidi, M.D.  Dr. Jamshidi reported the following impression:

> Irregularities and low signal abnormalities on the posterolateral aspect of left femoral head which probably represent edema and healing process of fracture which was documented on previous computed tomography. Similar changes are noted in left acetabulum medially. . . . [¶] It is highly suspicious for avascular necrosis.

---

         [1]    As the ALJ noted, and plaintiff concedes, plaintiff was last insured for benefits on December 31, 2001.  Further, plaintiff does not challenge the ALJ's finding that plaintiff engaged in substantial gainful activity from the alleged onset date through December 31, 1993. Therefore, the relevant period in this case is January 1, 1994, through December 31, 2001.  To be entitled to benefits, plaintiff must establish that disability began on or before December 31, 2001. Even though plaintiff's medical status after December 31, 2001, is not relevant to this determination, the court will discuss plaintiff's medical record after this date in order to provide a complete picture of the medical evidence.

         [2]    It is unclear whether this accident occurred on January 10th or January 14th.

4

1          Dr. Murray prepared a report dated August 3, 1989, following his examination of

2   plaintiff's left hip.  He reported that plaintiff was injured in a skiing accident in January 1989,

3   which resulted in dislocation of the left hip as well as fractures of L1, L2, L3, L4, L5, and the

4   right rib cage.  Dr. Murray noted the following:

5          At present, while he has no sitting pain, he has 4+ loading pain in the groin
           and a sensation that the hip is about to give way.  He has a limp when he
6          first gets up and walks.  His maximum walking tolerance is two to three
           blocks and then he has pain.  He is not working at this time because of hip
7          pain, as well as back pain.  He was able to return to work for a while
           during the months of May and June, assisting his farmer father, but he has
8          not been able to do so since because of the hip and back pain.  The click
           occurs when he rolls over in bed and it occurs when he rotates in the
9          relaxed fashion when he is up and about.  It does awaken him at night, but
           it does not prevent sleep.  He has crepitus and a click when he gets up out
10         of a chair.  Rotating produces the click and he states, "it usually only
           happens when I get up" or "when I throw a lateral on the hip."  I am not
11         too sure what this means, but I gather it is abduction or external rotation.
           The hip clicks at times when he goes up stairs and this is painful.  He goes
12         up stairs in a foot-over-foot fashion.  He performs the activities of daily
           living without difficulty.  Getting in and out of a low car is most likely to
13         produce the painful click, but he also has some clicks when he gets in and
           out of a truck.  There is a sensation of giving way, but this has not actually
14         happened.  He is not taking any pain medication.

15                       * * *

16         Orthopedic examination reveals a well-developed, well-nourished, alert,
           cooperative 30-year-old male, who stands 5'7-1/2" and weighs 158
17         pounds.  He walks without a limp.  Manipulation of the hip produces groin
           pain, but I cannot produce the click with any maneuver that he could
18         perform voluntarily or we could perform in combination or could be
           performed passively, although pain was produced.  He shows an excellent
19         range of motion of the hip.

20   In a September 26, 1989, follow-up report regarding plaintiff's left hip, Dr. Murray stated that he

21   was convinced plaintiff has:  (1) a limbus tear superiorly anteriorly; (2) a fracture through the

22   floor of the acetabulum in the acetabular fossa; (3) a compressed fracture of the anterior superior

23   aspect of the femoral head; and (4) multiple loose bodies within the joint.  Dr. Murray opined:

24         I think the options open to Mr. Chinchiolo are several.  One, of course,
           would be to do nothing and sit tight and see what happens.  The second
25         would be to examine the hip arthroscopically, remove the loose bodies if
           found, and debrie and repair the limbus tear as one would with a knee
26         meniscal tear.  This, however, would not allow treatment of the depressed

1  femoral head fracture if it is thought to be a significant factor.  However, it
2  would be the most innocuous procedure.  The other alternative would be
   open arthrotomy of the hip with removal of the loose bodies, removal or
   repair of the limbus tear and elevation of the depressed hip fracture via the
3  trapdoor technique using the patient's own bone.

4  <u>1990</u>

5  Plaintiff underwent a left hip arthroscopy on March 26, 1990, performed by Dr.

6  Sampson at Mount Zion Hospital in San Francisco.  Dr. Sampson's report indicates the following

7  history:

8  This is a 31-year-old white male who was in a skiing accident January 10,
   1989, at Sierra Ski Ranch where he suffered an anterior fracture
9  dislocation of his left hip.  It was reduced successfully closed.  Since that
   time he has had recurrent left groin pain and popping.  The MRI and CT
10 scans revealed no apparent loose bodies but damage to the superolateral
   femoral head.  [¶] Because of continued pain, popping, and occasional
11 buckling, he was brought in for arthroscopic examination and surgery.

12 <u>1994</u>

13 On May 10, 1994, W. Aubrey Federal, M.D., reported on an MRI of plaintiff's left

14 ankle performed the day before.  In his report, Dr. Federal provided the following conclusion:

15 Left ankle joint effusion.  Otherwise negative magnetic resonance
   imaging.  I am unable to visualize any definite ligament disruption, special
16 attention laterally.

17 <u>1995</u>

18 The record contains a report from Dr. Sampson following a November 13, 1995,

19 operation on plaintiff's left ankle.  According to the report, plaintiff injured his ankle at work on

20 March 7, 1994.  An arthroscopy was performed in August 1994.  The November 1995 procedure

21 was an examination of plaintiff's ankle under anesthesia due to continued pain and stiffness.  Dr.

22 Sampson removed spurs to permit better flexion.

23 ///

24 ///

25 ///

26 ///

1          <u>1997</u>

2          Plaintiff was admitted to St. Joseph's Medical Center on July 10, 1997, for over-

3 night pain management.  The admission report reveals that he underwent a total left hip

4 replacement in February 1996.  He was admitted with complaints of difficulty ambulating and

5 hip pain.

6          <u>1999</u>

7          Treatment notes from Dr. Sampson dated January 21, 1999, indicate that plaintiff

8 "is now four months post operative of his left total hip revision."  Dr. Sampson stated that

9 plaintiff was doing "very well" and only complained of minor anterior groin pain.  Examination

10 revealed good range of motion and that plaintiff could perform a straight leg raise.

11          <u>2000</u>

12          Plaintiff was seen again by Dr. Sampson on May 2, 2000.  Plaintiff complained of

13 pain and "noise" in the hip and told the doctor that, by the end of the day, he was in a lot of pain.

14 Plaintiff also told the doctor that he had been doing a "lot of lifting."  Examination revealed good

15 range of motion and "negative straight leg raising."

16          Plaintiff was admitted to St. Joseph's Medical Center on May 31, 2000.  Upon

17 discharge on June 4, 2000, plaintiff was diagnosed with "[c]ellulitis of right arm, right leg and

18 thigh due to foreign body injury."  The report indicates that plaintiff sustained an injury when he

19 was shot in the right thigh while using a nail gun.  The report also indicates that, at that time,

20 plaintiff was working as a contractor.

21          Dr. Sampson completed a progress note following his examination of plaintiff on

22 August 3, 2000.  The doctor's examination revealed painful flexion and a pop in plaintiff's hip.

23 Dr. Sampson's impression was "[s]prained iliopsoas status post total hip replacement."  The

24 doctor recommended an arthroscopic procedure to check the hip joint.  Dr. Sampson wrote a

25 letter to John Blinn, M.D., at St. Joseph's Medical Center the same day as his examination to

26 recommend the procedure.

1     <u>2001</u>

2            In February 2001, Victor W. Macko, M.D., at Stockton Orthopedic Medical

3   Group wrote a letter indicating that plaintiff's left hip pain was "probably related to his psoas

4   tendon."  He thought Dr. Sampson's recommendation for a tendon release procedure was

5   reasonable.  Dr. Macko's examination noted from February 9, 2001, revealed "point tenderness

6   near the ilipsoas attachment."  But, he noted that the "hip was not otherwise irritable on [range of

7   motion]."

8            A June 4, 2001, report from Jerry C. Crooks, M.D., at Stockton Orthopedic

9   Medical Group states:

10          [Plaintiff] has had a left total hip [replacement] done . . . by Dr. Sampson
            in San Francisco.  He had a revision three years ago for dislocation.  He
11          has had popping in his left hip for the last year and a half.  He is able to
            walk a very short distance because of pain.  He had difficulty raising his
12          leg.  He walks with a noticeable limp today.

13          Examination reveals flexion to 105 [degrees], internal and external is
            about 50% of normal.  He has pain with his movements.
14

15    <u>2002</u>

16           On February 5, 2002, plaintiff was seen by John F. Blinn, M.D., at Sutter Gould

17  Medical Group for a refill on his medication.  Dr. Blinn saw plaintiff again on February 28, 2002,

18  complaining of neck pain.  The notes from this visit indicate that plaintiff was not approved for

19  surgery by Dr. Sampson and that he was filing a "protest."

20           The following day – March 1, 2002 – Dr. Blinn conducted a physical examination.

21  Plaintiff's neck was "supple without . . . palpable adenopathy."  As to his hip, Dr. Blinn reported:

22          . . . When he goes up a step, he has to lead with his right foot and when he
            rotates the left hip inward or outward, on outward there is some pain and
23          tenderness.  There is some palpable tenderness in the left groin area when
            you palpate.  His gait is good.  Squat – he is able to squat down okay,
24          however, when he starts to straighten up he has some pain and discomfort
            but can straighten up okay.
25

26  ///

8

The examination report also reveals that plaintiff "works for his own construction company for a remodeling company." Plaintiff was seen again by Dr. Blinn on March 22, 2002, for hip and back pain, soreness, and tenderness. Medication was refilled. Dr. Blinn's record show notes from April 18, 2002, regarding plaintiff's difficulty getting his insurance company to approve treatment by Dr. Sampson. On May 13, 2002, Dr. Blinn noted that plaintiff "feels good" and that surgery by Dr. Samson was scheduled for June 28th.

Plaintiff was treated by Dr. Sampson on May 7, 2002, for pain in his left ankle and left hip. Examination of the left ankle revealed mild swelling. Examination of the left hip revealed "good range of motion, but there is a snap internal and external." Dr. Sampson did not recommend any further treatment for plaintiff's left ankle, but thought the left hip "needs to be arthroscoped and the scar needs to be removed and the iliopsoas needs to be released."

Plaintiff was admitted to St. Joseph's Medical Center on July 1, 2002, for arthroscopic surgery by Dr. Sampson, who reported the following operative findings:

> The total hip was all in good position; however, the locking mechanism, the polyethylene portion beyond the equator of the head, had fractured and the ring was loose.

Plaintiff was admitted to St. Joseph's Medical Center again on July 5, 2002, with left hip pain, status post left hip arthroscopy. The medical report indicates that plaintiff fell which exacerbated his left hip pain. He was "admitted for further management with IV narcotics. . . ." Physical examination was "[r]elatively unremarkable except for erythmia around the surgical site, well-healed, with some pain with motion of the left hip." Plaintiff was discharged on July 10th with a prescription for Oxycontin and instructions not to work until released by his treating physician. The discharge report states that plaintiff "has a tendency to overdo it and then he has pain because of that."

/ / /

/ / /

/ / /

9

1    Plaintiff was seen by Dr. Blinn on July 19, 2002, complaining of "pain with the

2  hip that needs to be fixed."  Dr. Blinn's notes indicate the following:

3        . . . Dr. Sampson tried to ligate the tendon.  It was not causing the
         problems.  The prosthesis seems to be falling apart so it needs to be
4        repaired.  We need to get Dr. Sampson's notes.

5  Plaintiff stated that he wanted to "go back to his Lortab 7.5 mg and Darvocet."  He told Dr. Blinn

6  that he didn't think Oxycontin "is as good."  Dr. Blinn prescribed the requested medication, in

7  addition to Xanax and Wellbutrin.  Plaintiff indicated to Dr. Blinn that his remaining Oxycontin

8  "will be disposed of appropriately."

9    On August 20, 2002, plaintiff was seen again by Dr. Sampson.  At that time,

10  plaintiff complained of "some of the same pains he had before [arthroscopic] surgery."  Dr.

11  Sampson indicated in his progress note from this visit that plaintiff "will continue to live with

12  this and undergo pain management by his local doctors. . . ."

13    Dr. Blinn's notes from September 20, 2002, indicate that plaintiff was taking

14  Vicodin and admonished not to take more than six per day due to the risk of Tylenol toxicity.  On

15  October 10, 2002, Dr. Blinn refilled plaintiff's prescriptions.  On October 28, 2002, plaintiff was

16  seen by Dr. Blinn for "a lot of left buttocks pain but not hip pain."  Dr. Blinn noted:  "He seems

17  to be taking his medicines more than six a day."  Dr. Blinn again refilled plaintiff's prescriptions.

18  On November 18, 2002, plaintiff complained to Dr. Blinn of "a lot of hip pain and hip soreness

19  still."  Dr. Blinn noted that an "x-ray of the left hip . . . showed that the retaining ring of the left

20  hip prosthesis had slipped and become dislocated."

21    <u>2003</u>

22    Plaintiff was seen again by Dr. Blinn on January 13, 2003, with continued

23  complaints of left hip pain and soreness.  At this visit, Dr. Blinn refilled plaintiff's prescriptions.

24  ///

25  ///

26  ///

1    Plaintiff was seen at the St. Joseph's Medical Center emergency room on

2    February 2, 2003, with the chief complaint of left hip pain.  On physical examination, plaintiff

3    was reported to be in mild distress with "slight left hip tenderness to palpation."  The range of

4    motion was "almost full."  Plaintiff was given medication and discharged.

5    The following day – February 3, 2003 – plaintiff was seen by Dr. Blinn with

6    continued complaints of left hip pain and soreness.  Dr. Blinn provided plaintiff with a full refill

7    of Vicodin, Valium, Darvocet, and Wellbutrin.  Dr. Blinn saw plaintiff again on February 24,

8    2003.  At that time, plaintiff reported "a lot of pain and discomfort." Plaintiff was again given

9    refills for Vicodin, Valium, Darvocet, and Wellbutrin.  On March 18, 2002, plaintiff complained

10   to Dr. Blinn of continued pain.  Dr. Binn refilled all of plaintiff's prescriptions.  On April 8,

11   2003, plaintiff returned to Dr. Blinn for more refills.  On April 17, 2003, plaintiff complained to

12   Dr. Blinn about low back pain.  On physical examination, Dr. Blinn noted "[s]oreness over the

13   left SI area."

14   Dr. Macko of Stockton Orthopedic Medical Group examined plaintiff again on

15   May 2, 2003.  Notes from this visit indicate that plaintiff complained of "quite a bit of pain in the

16   hip."  The notes also reveal that plaintiff "continues to be active, including an active job" and

17   that "he has skied since his last hip replacement."

18   On June 19, 2003, plaintiff was seen by Dr. Blinn with complaints of back and hip

19   pain.  Dr. Blinn's notes indicate that plaintiff "threw out his back working up in the cabin . . . ."

20   Dr. Sampson provided follow-up treatment on June 26, 2003.  In his progress

21   note, the doctor states that examination revealed groin pain and tenderness and a "quite good"

22   range of motion.  Dr. Sampson also noted, however, that plaintiff could "hardly straight leg

23   raise."  Dr. Sampson provided the following recommendation:

24   I think that since he has continued pain he needs a revision.  Because of
     his instability he would need to have a revision using either a large head
25   with metal on metal or metal high density polyethylene and possibly no
     restraining ring.  We have discussed this and he would like me to do it, but
26   he is out of network.  I have recommended he get authorization before we

1    do this.

2        Plaintiff was seen on August 15, 2003, for a full physical examination by Dr.

3    Blinn.  According to Dr. Blinn's notes, plaintiff "has been working nights starting up a laundro-

4    mat. . . ." and that plaintiff "is also working at his cabin up in the hills."  On physical

5    examination, Dr. Blinn noted "some pain when you rotate the left leg inward and outward."  Dr.

6    Blinn refilled prescriptions on August 29, 2003.  On September 22, 2003, plaintiff reported to Dr.

7    Blinn that he had right elbow pain.  Dr. Blinn noted that plaintiff's hip was stable, although

8    plaintiff said it was "still bothering him quite a bit."  On September 26, 2003, plaintiff continued

9    to complain to Dr. Blinn of right elbow pain.  Regarding medication refills, Dr. Blinn "told him

10   the pharmacy and I will only refill them every 30 days" and advised plaintiff "to cut back on his

11   activities so he does not use as many."

12        2004

13        On February 20, 2004, plaintiff reported right elbow pain to Dr. Macko.

14        On April 22, 2004, Dr. Blinn reported that plaintiff "did a lot of traveling and did

15   overtake his medicines in spite of my admonitions not to. . . ."  At that time, plaintiff continued

16   to complain of left hip pain.

17        In May 2004, an agency physician completed a residual functional capacity

18   assessment.  The doctor concluded:  (1) plaintiff could occasionally lift and carry 20 pounds and

19   frequently lift and carry ten pounds; (2) plaintiff could sit and stand for about six hours; and

20   (3) plaintiff was unlimited with respect to pushing and pulling.  The doctor also concluded that

21   plaintiff could frequently climb, balance, stoop, kneel, crouch, and crawl.  No visual,

22   communicative, environmental, or manipulative limitations were noted.

23        On May 18, 2004, plaintiff reported to Dr. Blinn that pain medications were

24   working to relieve his left hip pain and that he was stable enough to work.

25   ///

26   ///

1    On May 21, 2004, Michael Ries, M.D., at UCSF reported on a physical

2  examination of plaintiff.  Dr. Ries reported the following history:

3         The patient is a 45-year-old man who sustained an injury to his left hip as
      a result of a skiing accident in 1989 and underwent subsequent arthroscopic

4      surgery on three occasions by Dr. Sampson and was initially converted to a total
      hip arthroplatsy.  This was complicated by dislocation requiring conversion to a

5      constrained acetabula component.  However, he had experienced "clicking" and
      pain in the hip aggravated by routine functional activities but has not noted any

6      further instability.  Revision total hip arthroplasty has been recommended for
      management of his current symptoms either to a constrained component or a

7      larger femoral head.

8  On physical examination, Dr. Ries noted that plaintiff "ambulates with a slight coccyalgic gait

9  and has motion from 1 to 100 degrees of flexion, internal rotation of 15 degrees, and external

10  rotation of 35 degrees."  The doctor noted that recent x-rays revealed a displacement of the

11  constraining ring.   Dr. Ries' impression was of "[p]ainful left total hip arthroplasty consistent

12  with mechanical failure of a constrained component."

13    On June 14, 2004, plaintiff asked Dr. Blinn to complete a form incident to his

14  application for social security benefits.  Notes by Dr. Macko dated June 16, 2004, indicate that

15  plaintiff's right elbow pain was improved significantly with injections.  On August 27, 2004,

16  plaintiff complained to Dr. Blinn that he injured his left hip when he fell while pulling an awning

17  off a trailer.  Although plaintiff complained of left hip pain, Dr. Blinn's notes indicate "[t]he

18  patient feels really good."

19    On October 4, 2004, plaintiff was seen by Dr. Sampson for left hip pain.  Dr.

20  Sampson reported that plaintiff agreed to a hip revision surgery.

21         2005

22    Notes from Dr. Macko dated January 31, 2005, indicate that Dr. Sampson was

23  originally set to do the hip revision surgery but that he announced that he was no longer going to

24  do hip revisions.  Dr. Macko recommended Dr. Bargar.

25  ///

26  ///

On February 8, 2005, Dr. Blinn reported that plaintiff was going to be taking a skiing trip to Utah.  Plaintiff's prescriptions were refilled early.  Dr. Blinn noted that, other than occasional rectal bleeding, plaintiff "feels pretty good otherwise."

On April 5, 2005, plaintiff was seen by Dr. Bargar for an orthopedic consultation regarding the hip revision procedure.  Dr. Bargar noted the following:

> At the present time, the patient complains of marked pain in the groin, but only when lifting his leg. He gets minimal pain with straight leg walking and mild start-up pain.  He walks with a light-to-moderate limp.  He uses no ambulatory aid; he can still walk an unlimited distance.  He admits to being quite active and has been working in construction.  He has been lifting heavy objects and squatting, crawling, climbing, etc.  He is taking Lortabs . . . 1 every 4 hours and Valium, 1 at bedtime.  He is only on a Duragesic patch.

On physical examination, Dr. Bargar observed that plaintiff has a "Trendelenburg gait when he begins, but this smooths out and he tends to lurch over both hips, but only slightly."  As to hip range of motion, Dr. Bargar stated:

> . . . [T]here is flexion to 130 degrees bilaterally, with full extension, abduction 70 degrees bilaterally, adduction 30, external rotation 60 right and 80 left, and internal rotation is 20 right and 30 left.  The patient demonstrated that he has over 90 degrees of external rotation when he lifts his leg and externally rotates it by lifting his foot. He also demonstrates a clunk in his hip by shaking it and pivoting his left hip with no weight bearing.  This is palpable and audible.  Active straight leg raising causes no pain in the first inch or two off the table but after this, causes groin pain.  Seated straight leg raising also causes significant groin pain.  Hip abductors are 5/5; the leg lengths are equal.  Sensation is intact. . . .

In addition to plaintiff's left hip problem, Dr. Bargar thought plaintiff exhibits "[c]hronic use of narcotic and semi-synthetic narcotic medications and sedatives."  Dr. Bargar provided the following conclusions and recommendations:

> This patient admits to severe pain, but only when attempting to lift his leg. It is unclear to me why he is requiring the Duragesic patch, as well as the Valium and Lortabs.  In part, this may be due to his excessive activities. He has been doing essentially manual labor, and has been exceeding the recommended ranges of motion.  I strongly encouraged him to decrease his activities and stay within the hip precautions.  I gave him a copy of the standard hip precautions for total hips.

14

The patient apparently has some damage to the retention ring and, possibly, the polyethylene of the constrained liner, due to exceeding his range of motion. This may be causing some osteolysis, but it is not definitely visible on the plain x-rays. There is decreased density in the proximal femur, and there may be some osteolysis, but most of this may be stress shielding. He has had no dislocations since his conversion to a constrained liner.

In regards to pain, the patient states that the pain started when his hip was being reduced in the early post-operative period, and it was unchanged by conversion to a constrained liner. I do not feel that this present pain is coming from either osteolysis or the damaged liner. The pain is most likely caused by iliopsoas tendonitis.

I am reluctant to recommend revision surgery at this time in this patient. He is taking high doses of pain medication, including a narcotic patch. He has also been exceeding his limitations and I believe that this is responsible for most of the pain, as well as the damage to the acetabular component. If subsequent x-rays show significant increase in osteolysis, then I would recommend revision surgery. Most likely, with the revision of the entire acetabular component to one that would accept a large mono-polar head.

# III. STANDARD OF REVIEW

The court reviews the Commissioner's final decision to determine whether it is: (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a whole. See Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999). "Substantial evidence" is more than a mere scintilla, but less than a preponderance. See Saelee v. Chater, 94 F.3d 520, 521 (9th Cir. 1996). It is ". . . such evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 402 (1971). The record as a whole, including both the evidence that supports and detracts from the Commissioner's conclusion, must be considered and weighed. See Howard v. Heckler, 782 F.2d 1484, 1487 (9th Cir. 1986); Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985). The court may not affirm the Commissioner's decision simply by isolating a specific quantum of supporting evidence. See Hammock v. Bowen, 879 F.2d 498, 501 (9th Cir. 1989). If substantial evidence supports the administrative findings, or if there is conflicting evidence supporting a particular finding, the finding of the

Commissioner is conclusive.  See Sprague v. Bowen, 812 F.2d 1226, 1229-30 (9th Cir. 1987).

Therefore, where the evidence is susceptible to more than one rational interpretation, one of

which supports the Commissioner's decision, the decision must be affirmed, see Thomas v.

Barnhart, 278 F.3d 947, 954 (9th Cir. 2002), and may be set aside only if an improper legal

standard was applied in weighing the evidence, see Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th

Cir. 1988).

## IV.  DISCUSSION

In his motion for summary judgment, plaintiff argues:

I.      The ALJ committed reversible error by failing to consult a medical expert regarding the onset date of Mr. Chinchiolo's disabiltiy;

II.     The ALJ's finding that Mr. Chinchiolo had the residual functional capacity to return to his past relevant work as a "manual labor supervisor" is not based on substantial evidence as Mr. Chinchiolo never worked as a "manual labor supervisor"; and

III.    The ALJ's alternative finding that there is other work that Mr. Chinchiolo could perform is not based on substantial evidence since the [vocational expert's] testimony conflicts with the Dictionary of Occupational Titles ("DOT").

It is worth noting what plaintiff does not argue.  He does not argue that the ALJ erred in

evaluation of any of the medical evidence.  He does not argue that the ALJ erred in the severity

determination.  He does not argue that the ALJ erred with respect to application of the Listing of

Impairments.  He does not argue that the ALJ erred with respect to credibility.  And, he does not

argue that the ALJ erred in determining residual functional capacity.

### A.      Onset Date

Plaintiff contends that, "[s]ince the record is unclear exactly when Mr.

Chinchiolo's impairments became disabling, the ALJ erred in failing to obtain a medical expert

testimony regarding the onset date of his disability as required by Social Security [Ruling] 83-

20."  He cites Armstrong v. Commissioner, 160 F.3d 587 (9th Cir. 1998), in support of the

1   proposition that, when the evidence is not definite as to onset date, the ALJ must seek an opinion

2   from a medical advisor.  The factual bases of this argument are: (1) at some point plaintiff was

3   disabled; (2) but the date such disability began is uncertain.

4       While the court accepts plaintiff's statement of the law, the court finds that the

5   first factual premise is incorrect.  Specifically, the ALJ concluded that plaintiff was never

6   disabled.  The ALJ stated:

7      I thus find that at all relevant times, considering all of the evidence of
   record, including the claimant's allegations of pain and other symptoms,

8      that the claimant has been able to perform a limited range of light work
   with a slight limitation in the ability to perform overhead reaching

9      bilaterally, and slight limitation in his ability to perform simple, repetitive
   tasks while bearing a slight to moderate degree of pain, and requiring

10     occasional supervision. . . .

11  Plaintiff does not challenge any aspect of this finding.  As defendant notes, the ALJ's duty to

12  obtain medical consultation as to onset date was never triggered in this case because plaintiff was

13  never disabled.   Contrary to plaintiff's contention that the record is unclear exactly when

14  disability began, the record is clear that disability never began.

15    **B.**  <u>**Past Relevant Work**</u>

16     Plaintiff argues:

17     . . . The ALJ . . . concluded that Mr. Chinchiolo "has no
   impairment which has precluded the performance of his past relevant work

18     as a manual labor supervisor for any period of time which lasted for any
   consecutive 12 month period prior to his date last insured." (citation to

19     hearing decision omitted).  However, the record does not document that
   Mr. Chinchiolo ever worked as "manual labor supervisor." As such, his

20     finding that Mr. Chinchiolo can return to his past relevant work cannot be
   sustained.

21

22  Plaintiff observes that the vocational expert described plaintiff's past relevant work, in part, as

23  follows: "[F]rom '75 to 1990 [plaintiff] was a supervisor for, for cherry pickers or a cherry plant,

24  and that would be considered light, skilled. . . ."  He then argues:

25     Mr. Chinchiolo elaborated . . . in written testimony that his job as a
   shipping supervisor for a cherry packing plant, he supervised the loading

26     of trucks, frequently used tools, was required to use technical skills,

1    prepared reports or similar duties; lifted 20 pounds occasionally and 10
     pounds frequently and supervised other people. (citation to CAR omitted).
2    At the initial levels of review, the State agency described this job as a
     "shipping supervisor" which is listed as job number 222.137-030 in the
3    Dictionary of Occupational Titles ("DOT").  (footnote and citation to CAR
     omitted).
4            At the hearing, Mr. Chinchiolo attempted to elaborate that he had
     supervised people "back in cherries from 1990 back," but the ALJ
5    interrupted him and informed him that he was only interested in his
     supervisory duties in his construction work. (citation to CAR omitted).
6    Mr. Chinchiolo testified that he was self employed in that work and
     worked as a sole proprietor. (citation to CAR omitted).  He never testified
7    that he supervised manual laborers, as the ALJ found.
             Indeed, there is absolutely no support for the ALJ's finding that
8    Mr. Chinchiolo ever worked as a "manual labor supervisor." (citation to
     CAR omitted).  The only supervisory job he had was the shipping
9    supervisor position. (citation to CAR omitted).  As such, the ALJ's finding
     that Mr. Chinchiolo can return to a job he never performed cannot be
10   sustained.

11           Because it cannot be disputed that plaintiff's past relevant work included work as

12   a supervisor, the only issue is whether the ALJ erred in concluding that plaintiff supervised

13   individuals performing "manual labor."  The court agrees with defendant that plaintiff's

14   argument is based on semantics and that there was no error.  Plaintiff admitted that he supervised

15   workers in a cherry picking business.  In addition, plaintiff does not dispute the ALJ's residual

16   functional capacity finding that he can still perform supervisory work.  The relevant finding the

17   ALJ made was not what kind of worker plaintiff supervised in the past, but that his past relevant

18   work included supervising workers.  Because plaintiff could still perform this function, the ALJ

19   did not err in finding that plaintiff could perform his past relevant work as a supervisor.

20       **C.    Vocational Expert's Testimony**

21           Because the court finds no error in the ALJ's finding regarding past relevant work,

22   plaintiff is not disabled and it is not necessary to address plaintiff's final argument.  Nonetheless,

23   assuming for the moment that the ALJ erred in determining that plaintiff can perform his past

24   relevant work as a supervisor, the court will consider whether the ALJ erred in alternatively

25   concluding that plaintiff could perform other work consistent with the residual functional

26   capacity for a limited range of light work.  In so doing, the court notes again that plaintiff does

1   not challenge the ALJ's residual functional capacity determination that:  (1) plaintiff can perform

2   a limited range of light work; (2) plaintiff has a slight limitation in the ability to reach overhead;

3   (3) plaintiff has a slight limitation in the ability to perform simple repetitive tasks while bearing

4   mild to moderate pain; and (4) plaintiff requires occasional supervision.

5           Plaintiff argues:

6                   The VE's testimony that an individual who has a slight limitation
            in the ability to reach overhead and perform simple repetitive tasks could
7           perform work as a storage rental facility clerk, assembler of small parts,
            and cashier conflicts with the DOT.  First, all of these jobs entail frequent
8           reaching, which is from 1/3 to 2/3 of the time.  *See* Exhibits D-F.
            Reaching is defined as "extending the hands and arms in any direction"
9           which would include overhead.  *See* SSR 85-15, *found at* 1985 WL 56857
            (S.S.A. 1985).  As such, these three jobs could not, in fact, be performed
10          by an individual who has even a slight limitation in the ability to reach
            overhead, which, according to the ALJ, could not reach overhead for two
11          hours out of 8-hour workday.  (Tr. 352).

12  As to this argument, the court finds that plaintiff misinterprets the ALJ's hypothetical.  In his

13  hypothetical question to the vocational expert concerning plaintiff's ability to perform work other

14  than his past relevant work, the ALJ defined "slightly limited in overhead reaching" as "being . . .

15  six hours or less per shift."  (see CAR 352 and 353).  To this hypothetical, the vocational expert

16  testified that plaintiff could perform work as an assembler, cashier, or sales counter clerk with

17  only a 15% erosion in the job base.  Plaintiff twists the ALJ's definition.  By saying that plaintiff

18  could reach overhead for up to six hours in an eight-hour day, the ALJ did not say that plaintiff is

19  precluded from reaching overhead for as much as two hours in an eight-hour day.  Even though

20  six and two add up to eight, plaintiff's version of the ALJ's limitation is not accurate.  In other

21  words, the ALJ concluded that plaintiff's ability to reach overhead was only slightly limited, not

22  that he had only a slight ability to reach overhead.  The ALJ's limitation of reaching for up to six

23  hours out of eight hours is certainly consistent with the DOT's definition of frequent reaching.

24  / / /

25  / / /

26  / / /

Plaintiff next argues:

> Second, the jobs of a storage facility rental clerk and cashier both have reasoning levels of "3" and the job of assembler has a reasoning level of "2" and could not be performed by an individual who has a slight limitation in the ability to perform even simple, repetitive tasks. *See* Exhibit D-F. According to the ALJ, the individual could not perform simple, repetitive tasks for two hours out of an 8-hour workday. (Tr. 352). The reasoning functions are part of the General Educational Development ("GED") of the job, which "embraces those aspects of education (formal and informal) which are required of the worker for satisfactory job performance." (footnote omitted). According to the DOT, only reasoning level "1" jobs can be performed by an individual who can understand and carry out simple instructions. Thus, jobs at reasoning levels of "2," and "3" could not be performed by Mr. Chinchiolo, who has a slight ability to perform simple repetitive tasks.

> Indeed, the ALJ failed to comply with Social Security Ruling 00-4p in not asking the VE if his testimony was consistent with the Dictionary of Occupational Titles ("DOT") as required. *See* SSR 00- 4p, *found at* 2000 WL 1898704 (S.S.A. 2000). Social Security Ruling 00-4p clarifies the standards for the use of vocational experts, and discusses the circumstances when the occupational evidence provided by a VE is not consistent with the DOT. This Ruling states that when there is an apparent unresolved conflict between the testimony of the VE and the DOT, the ALJ is required to elicit a reasonable explanation for the conflict before relying on the VE's testimony. As part of the ALJ's duty to "fully develop the record," the ALJ is required to inquire, on the record, as to whether or not the VE's testimony is consistent with the DOT. The Ruling specifically states that neither the DOT nor the VE testimony:

>> automatically "trumps" when there is a conflict. The adjudicator must resolve the conflict by determining if the explanation given by the VE or VS is reasonable and provides a basis for relying on the VE or VS testimony rather than the DOT information. . . .

>> *When vocational evidence provided by a VE or VS is not consistent with information in the DOT, the adjudicator must resolve this conflict before relying on the VE or VS evidence to support a determination or decision that the individual is or is not disabled.* The adjudicator will explain in the determination or decision how he or she resolved the conflict. The adjudicator must explain the resolution of the conflict irrespective of how the conflict was identified.

>> *Id.* (Emphasis added).

> The Tenth Circuit has remanded a case "to allow the ALJ to address the apparent conflict between Plaintiff's inability to perform more than simple and repetitive tasks and the level-three reasoning required by the jobs identified as appropriate for her by the VE." *Hackett v. Barnhart*, 395 F.3d 1168, 1176 (10th Cir. 2005). A California court held in *Allen v.*

1

2

3

4

5

> *Barnhart*, Case No. C 02-4171 SI, 2003 WL 22159050 at *10 (N.D.
> Cal.2003), that jobs with GED reasoning level of 2, which presupposes
> ability to follow detailed and involved instructions, exceeded
> administrative law judge's limitation to simple, routine tasks.  Other courts
> have remanded cases because the VE's testimony conflicted with the
> reasoning level of jobs as set forth in the DOT.  (footnote omitted).
>
> In ths case, it is apparent that the VE's testimony conflicts with the
> DOT.  Thus, this Court should remand this case with instructions to
> resolve this conflict as required by SSR 00-4p.

6  Again, this argument rests on a misinterpretation of the ALJ's residual functional capacity

7  finding.  The ALJ concluded that plaintiff has a "slight limitation in his ability to perform simple,

8  repetitive tasks" while bearing mild to moderate pain.  According to plaintiff, "slight limitation"

9  in this context means that he can only perform simple, repetitive tasks for up to two hours in an

10  eight-hour day.  This is not correct.  As with plaintiff's argument above, even though two and six

11  are eight, plaintiff's interpretation is not accurate.  The ALJ made it clear that he found that

12  plaintiff had only a slight limitation in ability to do simple, repetitive tasks.  In other words,

13  plaintiff could mostly perform such tasks.  The ALJ did <u>not</u> find that plaintiff has a "slight

14  ability" to perform simple, repetitive tasks.  Furthermore, the slight limitation the ALJ did note

15  was only with respect to performing such tasks <u>while bearing pain</u>.  Thus, assuming no pain,

16  there would be no limitation at all.

17  Properly interpreted, the ALJ's hypotheticals correctly reflect plaintiff's residual

18  functional capacity and the vocational expert's responses comport with the definitions set forth in

19  the DOT.

20  / / /

21  / / /

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

**V.  CONCLUSION**

Based on the foregoing, the court concludes that the Commissioner's final decision is based on substantial evidence and proper legal analysis.  Accordingly, IT IS HEREBY ORDERED that:

       1.     Plaintiff's motion for summary judgment (Doc. 20) is denied;

       2.     Defendant's cross-motion for summary judgment (Doc. 22) is granted; and

       3.     The Clerk of the Court is directed to enter judgment and close this file.

DATED: May 1, 2008

                                        _____
                                        **CRAIG M. KELLISON**
                                        UNITED STATES MAGISTRATE JUDGE